[Cite as *In re K.P.*, 2021-Ohio-552.]

COURT OF APPEALS
GUERNSEY COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN THE MATTER OF:

K. P.

JUDGES:
Hon. W. Scott Gwin, P. J.
Hon. John W. Wise, J.
Hon. Earle E. Wise, Jr., J.

Case No. 20 CA 000021

O P I N I O N

CHARACTER OF PROCEEDING:      Appeal from the Court of Common Pleas, Juvenile Division, Case No.  18 JC 408

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      March 1, 2021

APPEARANCES:

For Appellant Mother

JEANETTE M. MOLL
JEANETTE M. MOLL LLC
P. O. Box 461
Zanesville, Ohio  43702

For Father

JENNIFER ZAAYER
10845 Madison Township Road 56
Mount Perry, Ohio  43760

For Appellee GCCS

MELISSA M. WILSON
274 Highland Avenue
Cambridge, Ohio  43725

For CASA

MAGGIE BOYD LaPLANTE
139 W. 8th Street
Cambridge, Ohio  43725

*Wise, John, J.*

{¶ 1}   Appellant-Mother B.W. appeals from the judgment entered in Guernsey County Court of Common Pleas, Juvenile Court Division, which terminated all parental rights, privileges and responsibilities of the parents with regard to the minor child K.P. and ordered that permanent custody of the minor child be granted to Guernsey County Children Services.

{¶ 2}   This appeal is expedited, and is being considered pursuant to App.R. 11.2(C). The relevant facts leading to this appeal are as follows:

**STATEMENT OF THE FACTS AND CASE**

{¶ 3}   This appeal pertains to the permanent custody disposition of the minor child K.P. (DOB 5/21/2018). K.P. is the child of Brittney W. fka Brittney E. and John P.

{¶ 4}   On October 4, 2018, Guernsey County Children Services (GCCS) filed a complaint alleging that K.P. was a dependent child. An Ex Parte Order of Custody was issued, and the child was placed in the emergency custody of GCCS.  Prior to October 4, 2018, the child had been placed in an out-of-home safety plan with three different kinship placements from May 24, 2018, to October 4, 2018. The child has never been in the physical custody of the mother or father since birth.

{¶ 5}   On December 28, 2018, the child was adjudicated Dependent pursuant to R.C. §2151.04(c) and placed in the temporary custody of GCCS.

{¶ 6}   On January 4, 2019, the trial court held a Dispositional Hearing, following which temporary custody of the child was continued with GCCS.

{¶ 7}   On April 1, 2019 and June 18, 2019, the trial court held Review Hearings.

{¶ 8}   On September 11, 2019, the trial court held an Annual Review Hearing.

**{¶ 9}**  On December 13, 2019, March 6, 2020, and June 2, 2020, the trial court held Review Hearings.

**{¶ 10}** On July 15, 2020, GCCS filed a Motion to Modify Dispositional Orders to one of Permanent Custody to GCCS.

**{¶ 11}**  On October 27, 2020, a hearing was held on GCCS' Motion for Permanent Custody. At the hearing, the trial court received evidence and heard testimony from Family Support Specialist Darius Jones, Caseworker Annika Burga, Caseworker Staci Yakupcak, Appellant-Mother BW, Appellant-Mother's husband Michael W., and CASA Julia Dowling.

**{¶ 12}** Family Support Specialist Darius Jones (FSS Jones) testified that Appellant-Mother's first visit with her child was July 29, 2019. (T. at 12). FSS Jones stated that when "we first set up visits, visitation went very well. Throughout I would say a month or so, they started to get a little sporadic as well. I would say over all, visits have been inconsistent to the point where I had to contact Appellant-Mother and let her know that she needed to either arrive at the agency early, or contact me prior to the day of the visit, or at least a decent time of the day of the visit to let me know she would attend so that I can inform foster parents, and they could transport K.P. in the visits." (T. at 13).

**{¶ 13}** FSS Jones reviewed the visits that Appellant-Mother attended beginning with the July 29, 2019, visit. Thereafter, between October 29, 2019, and October 20, 2020, Appellant-Mother cancelled or failed to show for approximately 25 visits. (T. at 14-16). In total, between July 29, 2019, and October 20, 2020, she only attended a total of 14 visits, which amounted to approximately 14 hours of time spent with K.P. (T. at 16).

{¶ 14} Ongoing Caseworker Annika Burga testified that Appellant-Mother was not substantially compliant with her case plan. She stated that Appellant-Mother was asked to complete a drug and alcohol assessment and follow all recommendations. She was also required to demonstrate an ability to maintain sobriety for an extended period of time (T. at 35). Appellant-Mother worked a sober living program at Alvis House in Columbus when she was released from prison in addition to completing the IOP program. (*Id.*) Appellant-Mother was asked to complete an assessment at Guernsey Health Choices on March 5, 2020, due to a positive drug screen, which she did on September 2, 2020. (Tr. Pg. 36) In addition, Caseworker Burga testified that the Court, on March 4, 2020, also recommended that the Mother get into drug and alcohol services again, which she failed to do until September 2, 2020. (T. at 36).

{¶ 15} Mother was requested to complete random drug screens through the Agency or her provider, and any refusal would be considered a positive. (T. at 36) Caseworker Burga testified to those screens. (T. at 37). Appellant-Mother had negative screens through Alvis House between 5/28/19 and 8/27/19. (*Id.*) Caseworker Burga also testified as to drug screens given by GCCS. Appellant-Mother tested positive on 6/19/18 for amphetamine, methamphetamine, cocaine, BZE, EMA, which is a B metabolites of cocaine; on 3/5/20 for THC; on 8/26/20 for amphetamine, methamphetamine, THC and buprenorphine; on 9/30/20 for buprenorphine; and on 10/2/20 for buprenorphine. (T. at 39). Caseworker Burga testified that the Mother does have a valid prescription for buprenorphine. (*Id.*) Caseworker Burga testified that Appellant-Mother refused a drug screen on May 15, 2020 and admitted to THC use.

{¶ 16} Appellant-Mother was asked to attend and complete a parenting assessment at a provider of choice and follow all recommendations and demonstrate appropriate parenting skills while interacting with K.P. (T. at 40). Caseworker Burga testified that on June 14, 2019, Appellant-Mother did start a parenting group at Alvis House and graduated from that program on August 17, 2019. (*Id.*)

{¶ 17} Appellant-Mother was also asked to complete a mental health assessment at a provider of choice and follow all recommendations and demonstrate proper coping mechanisms for stress (*Id.*) Caseworker Burga testified that this was completed on July 24, 2019, at Alvis House. Appellant-Mother was diagnosed with bipolar disorder and anxiety and was prescribed medication. (T. at 41). When Mother finished Alvis House, she refused to continue those medications. (*Id.*)

{¶ 18} On September 2, 2020, Appellant-Mother completed a mental health assessment at Guernsey Health Choices. (*Id.*) Appellant-Mother was recommended for weekly services of outpatient mental health, substance use disorder, anxiety symptoms, recovery support, relapse prevents and substance disorder education. (*Id.*) She was asked to do this assessment due to a new report received by the Agency on August 26, 2020, and her positive drug screen for methamphetamine, amphetamine, THC and buprenorphine. (T. at 42).

{¶ 19} Ongoing Caseworker Staci Yakupcak testified that she had been the caseworker for the family for less than a month at the time of the Permanent Custody hearing. (T. at 63). She also testified as to drug screens of Appellant-Mother. She stated that on October 15, 2020, Appellant-Mother tested positive for oxycodone, for which she had a prescription. Caseworker Yakupcak also testified as to the drug screens from Spero

Health where Appellant-Mother is prescribed Buprenorphine. (*Id.*) On July 2, 2020, she tested positive for Buprenorphine, Norbuprenorphine, Gabapentin, and THC. On August 6, 2020, she was positive for Buprenorphine, Norbuprenorphine, Naloxone, Gabapentin, and THC. On September 3, 2020, she was positive for Buprenorphine, Norbuprenorphine, Naloxone, Gabapentin and THC. (Id) On October 1, 2020, she was positive for Buprenorphine, Norbuprenorphine, Naloxone, Gabapentin, THC, Desmethylcitalopram, and October 8, 2020 positive for Buprenorphine. (Tr. P. 64 and 65). Caseworker Yakupcak testified that on October 9, 2020, Appellant-Mother tested positive for Buprenorphine, Norbuprenorphine, Naloxone and THC metabolites for Guernsey Health Choices. (*Id.*) Caseworker Yakupcak testified that Appellant-Mother did not have a medical marijuana card. She further testified that Mother received a prescription for gabapentin on September 28, 2020. (*Id.*) She indicated that she tested positive for gabapentin without a prescription on July 2, 2020, August 6, 2020, and September 28, 2020. (*Id.*)

{¶ 20} Ms. Yakupcak also testified that Appellant-Mother was not in compliance with Guernsey Health Choices for October, 2020. (T. at 66).

{¶ 21} With regard to possible kinship placements, Caseworker Burga testified that there were three kinship individuals identified that provided safety plans originally for the child. (T. at 51). In 2018, GCCS looked into Michael W., who is now Appellant-Mother's current husband. (*Id.*) The kinship process was initiated but at the time he was living with people that had known criminal history, so it was explained that he would not be able to take K.P. into that home. However, he was advised that if he were to get a new home, he

was to contact the agency. (*Id.*) He then reported that he was going to work as a truck driver and go back over the road. (*Id.*)

{¶ 22} Ricky Early was also considered for kinship placement, but he was unable to care for K.P. because he and his partner both had full time jobs. (T. at 52). Amy Shepherd, the biological Father's ex-wife, called the Agency to be considered as kinship. (*Id.*) However, Ms. Shepherd has extensive child welfare history and was denied due to not having any further communication with the agency. (*Id.*)

{¶ 23} On August 26, 2020, Appellant-Mother again asked if Michael W. could be considered for kinship. After consulting with Supervisor Angela Grywalsky, the Agency felt that it was in K.P.'s best interest not to go through the kinship home study with Michael W., as he was living with Appellant-Mother and had no type of bond with K.P. (*Id.*)

{¶ 24} Appellant-Mother had another child, which the Agency learned about in August, 2020, when it received a new report with concerns for that child. A drug screen was given to Appellant-Mother on August 26, 2020, which was positive for methamphetamine, amphetamine, THC and buprenorphine. (T. at 42). For a period of time an out of home safety plan was put in place for that child, which was then changed to a task list as of September 16, 2020. (T. at 43). Michael W. is responsible for the care of that child, and when he has to go to work, either the out-of-home safety plan person (Janelle Olson) or Appellant-Mother's mother, Mary, is to babysit the child. (T. at 44). Appellant-Mother is not to be alone with her new baby. (T. at 66). Caseworker Yakupcak testified that if the Agency were to find out that Appellant-Mother was alone with her newborn, the Agency would investigate doing a safety plan, custody, or whatever was necessary to keep the child safe. (T. at 66).

**{¶ 25}** Caseworker Burga testified that K.P. is well bonded with his Foster Parents, Jessica and David Davis. (T. at 53). She stated that as of the date of the permanent custody hearing, K.P. has been in Agency custody for 754 days. (T. at 48). The concerns of the Agency are that the Mother has had a positive drug screen for illegal drugs in the last 90 days, that she has not been consistent with visitation the entire time GCCS has been involved, and that she herself stated that there is no bond between her and K.P. (T. at 48-49).

**{¶ 26}** Caseworker Burga further testified that even if given additional time, K.P. could not be reunified with either of his parents. (T. at 50). She indicated that "K.P. has been out of the Mother's care for 887 days. He has either been on a safety plan or in agency custody. I don't believe that there will be enough time to build a bond considering he's been out of the home that many days, and there has not been consistent visitation to grow that bond, and I believe it's too late at this point." (*Id.*)

**{¶ 27}** The CASA/GAL Julia Dowling testified that she believed that permanent custody was in the best interest of the child. (T. at 97). When asked whether she had concerns with the Mother's lack of engagement with the child she responded, "I think in my opinion, and it's just my opinion, it's a little too late." (*Id.*)

**{¶ 28}** By Judgment Entry filed November 9, 2020, the trial court granted permanent custody of the minor child K.P. to GCCS.

**{¶ 29}** Appellant-Mother now appeals, raising the following assignments of error:

**ASSIGNMENTS OF ERROR**

**{¶ 30}** "I. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILD WOULD BE SERVED BY THE GRANTING OF

PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

{¶ 31} "II. THERE WAS NOT CLEAR AND CONVINCING EVIDENCE FOR THE TRIAL COURT TO FIND THAT THE MINOR CHILD SHOULD NOT BE PLACED WITH APPELLANT AND THAT IT WAS IN THE MINOR CHILD'S BEST INTEREST TO BE PLACED IN THE PERMANENT CUSTODY OF GUERNSEY COUNTY CHILDREN'S SERVICES."

I., II.

{¶ 32} Appellant has not separately addressed her two assignments of error. We shall therefore address them together as Appellant did in her argument.

{¶ 33} In her two assignments of error, Appellant argues the trial court erred in finding that it was in the minor child's best interest to be placed in the permanent custody of GCCS. We disagree.

{¶ 34} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries,* Stark App. No. CA5758 (Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶ 35} R.C. §2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. §2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody

of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶ 36} Following the hearing, R.C. §2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

{¶ 37} In determining the best interest of the child at a permanent custody hearing, R.C. §2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

{¶ 38} Therefore, R.C. §2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. §2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

{¶ 39} Here, R.C. §2151.414(B)(1)(d) applies as the child has been in the temporary custody of the Agency for twelve or more months of the consecutive twenty-two month period. The trial court found that the minor child had been out of the mother's care for 887 days.

{¶ 40} The trial court also found that the child had been abandoned. R.C. §2151.141(B)(1)(b).

{¶ 41} The trial court then turned its focus to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. R.C. §2151.414(B)(1)(a).

{¶ 42} The trial court found that Appellant-Mother has had six children, and only the four month old child is currently in her custody. All her other children are in the legal custody of other persons. The court noted that there has been a history of eighteen reports to GCCS over the years regarding Appellant-Mother's care of her children. The court also found that neither Appellant-Mother nor her current husband have any bond with K.P. The only family this child, who was 29 months old at that time, has known in the last 2 ½ years is his foster parents.

{¶ 43} Under R.C. §2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it

determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. §2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶ 44} Upon review, as set forth in detail above, we find the evidence at the Permanent Custody hearing shows that Appellant-Mother was not in compliance with her case plan, that she continued to test positive for illegal substances, that she did not actively participate in visitation with her child, and that she lacked a bond with her minor child.

{¶ 45} Based upon the foregoing, we find there was clear and convincing evidence to support the trial court's finding that it was in the best interest of the children to grant permanent custody to PCCS, and that said decision is not against the manifest weight of the evidence.

{¶ 46} Appellant-Mother's assignments of error are overruled.

{¶ 47} The judgment of the Court of Common Pleas, Juvenile Division, Guernsey County, Ohio, is affirmed.

By: Wise, John, J.

Gwin, P. J., and

Wise, Earle, J., concur.

JWW/kw 0225